CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

EVAN MATEER (CABN 326848)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Evan.mateer@usdoj.gov

Attorney for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:24-CR-403-AMO |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| CARRIE LYNN GRANT, | |
| Defendant. | |

## I. INTRODUCTION

Defendant Carrie Lynn Grant is set for sentencing having plead guilty to one count of wire fraud. Her conviction arises out of a years long scheme in which she abused her position with an educational charity to steal nearly two million dollars of charity funds, spending the money on, among other things, luxury travel, lavish entertainment, and a condo in Hawaii. The government recommends a sentence of 37 months in prison to be followed by a 3-year term of supervised release.

## II. OFFENSE CONDUCT AND BACKGROUND

### A. Offense Conduct

Over the course of nearly 6 years, Grant abused her position as a financial manager for a northern California charity organization (Charity 1), embezzling nearly two million dollars of charity funds, which she spent on lavish personal expenses. Grant's scheme to defraud was catastrophic for Charity 1, resulting in a drastically reduced staff and significantly reducing the number of underprivileged students that the charity was able to serve.

#### 1. In 2015, Grant begins working for Charity 1, eventually being assigned the duties of financial manager

On May 19, 2025, Grant began working with Charity 1. PSR ¶9. Charity 1 is a non-profit organization that provides educational materials and programing to underprivileged children. PSR ¶6. Grant had numerous positions at Charity 1, including office administrative manager, human resources manager, and finance manager. PSR ¶9. As part of her duties, Grant was responsible for making disbursements on behalf of Charity 1, and had signing authority for Charity 1's bank accounts. PSR ¶6, 9. Beginning no later than July 1, 2017, Grant abused this position of trust within Charity 1 to steal nearly two million dollars.

#### 2. Grant made fraudulent payments to Charity 2 as cover to deposit Charity 1 funds into her personal bank account

The largest portion of Grant's scheme related to fraudulent payments that she allegedly made to Charity 2 on behalf of Charity 1, when in fact she deposited the money into her own bank account. Charity 1 is the northern California affiliate of Charit 2, which is a national organization. PSR ¶7. As a local affiliate, Charity 1 makes frequent payments to Charity 2 for program fees, materials, employment benefits, pension contributions, and other payments. *Id*. As finance manager, Grant was responsible

for making these payments. *Id.*

From 2017 to 2023, Grant initiated at least 82 fraudulent transactions that were purportedly for legitimate payments to Charity 2, but in fact deposited funds in her personal account. PSR ¶18. 62 of these payments were fraudulent ACH payments. *Id.* The other 20 were fraudulent checks that Grant deposited into her personal account. *Id.* On some of the checks, Grant forged the name of the President of Charity 1. As part of the scheme, Grant made false entries in Charity 1's systems in order to disguise the payments. *Id.* She also creating fake invoices that purported to support the payment from Charity 1 to Charity 2. Charity 1 confirmed with Charity 2 that none of these 82 payments were supported by a legitimate invoice. PSR ¶19. In total, from 2017 to 2023, Grant stole nearly $1.6 million as part of this portion of the scheme. *Id.*

### 3. Double Payment of Vendor Invoices

Grant also stole Charity 1 funds under the cover of paying legitimate expenses to outside vendors. For example, on February 14, 2025, Charity received an invoice for approximately $22,000 from a golf club related to an event that Charity 1 had held at the venue. PSR ¶21. As finance manager, Grant was responsible for paying this invoice. But instead of doing so, on March 17, 2023, Grant made a payment in the amount listed on the invoice to her personal account, describing it as a payment to the golf club. *Id.* Grant followed a similar pattern with respect to invoices for Charity 1's office space. PSR ¶23. In both cases, Grant lied about her fraud when other Charity 1 employees inquired about the unpaid invoices. PSR ¶21-23.

### 4. Grant Stole Charity 1 Funds Intended for Deposit in Employee 410k Accounts

A third category of Grant's fraud concerned the theft of money that was intended for deposit into the 410k accounts of Charity 1's employees. In September 2022, Charity 1 had changed payroll providers. PSR ¶14. During a transitional period, the previous payroll provider transferred employee 401k contributions to Charity 1's bank account directly. *Id.* Charity 1 was then responsible for transferring these funds to the new payroll provider, who would then fund the 401k accounts. *Id.* Grant was the employee specifically responsible for making these transfers. *Id.* But during the four-month transition period, Grant made no transfers to the new payroll provider, and as a result in January 2023,

Charity 1 had a surplus of approximately $50,000 awaiting transfer. *Id.* On January 18, 2023, Grant transferred nearly $50,000 into her personal account, falsely describing it as a payment to the new payroll provider. PSR ¶15, 16.

### 5. Grant used the stolen money to fund a lavish lifestyle

Grant used the money she stole from Charity 1 to fund a lavish lifestyle that was beyond her means.[1] PSR ¶6. In 2021, Grant purchased a condominium in Hawaii with $110,000 in cash. This transaction was traced to funds stolen from Charity 1. Grant also used the money she stole from Charity 1 to attend football games in luxury seats, purchasing courtside tickets for Golden State Warriors games, to purchase concert tickets, and for travel, including firs class airfare. Grant documented much of her lavish spending on her social media accounts. Examples of her posts are reproduced below:

  

Grant also used the funds to pay for the rent of her personal home, to make credit card payments, to pay her daughter's college tuition, retail purchases, online purchases, furniture, auto loan payments, and groceries.

### 6. After Charity 1 uncovered Grant's fraud, she continues to attempt to conceal her scheme

The failure to fund the 410k accounts, caused certain employees of Charity 1 to complain, which caused Charity 1 to meet with Grant and ask about the why the contributions had not been sent to the new payroll provider. PSR ¶15. Grant was unable to provide a satisfactory answer for why the payments were not made, and Charity 1 began an audit. *Id.* The auditor identified the January 18, 2023

---

[1] Grant's salary at Charity 1 was approximately $64,000 in 2023.

into Grant's personal account, and confronted Grant about it. PSR ¶16. Grant provided a document that she claimed was an invoice associated with the January 18 payment; but Grant had in fact forged this document the day before. *Id.* Thereafter, Grant was interviewed by Charity 1's outside counsel. PSR ¶17. Grant eventually admitted that she made the January 18 payment into her own account, but claimed that she reversed the payment. *Id.* In support of this claim, Grant forged a bank statement that purported to show the reversal. *Id.* The reversal never happened. *Id.* Charity 1 terminated Grant, and further investigation revealed the additional fraud described above.

In total, Grant stole approximately $1.9 million from Charity 1.

### 7. Grant's theft had a devastating effect on Charity 1

Grant's theft severely impacted Charity 1's operations, significantly reducing their effectiveness in serving the public. *See* Victim Impact Statement of the President of Charity 1. Within the organization itself, during the period of Grant's fraud, the organization was forced to layoff team members, reducing the size of their staff from 22 to 16. This in turn has severely impacted Charity 1's charitable programs: while in 2019 they served 90,000 students, by 2023, they only managed to serve 50,000 students.

### 8. Grant continues to deny her culpability for the scheme

As described below, in August 2025, Grant plead guilty to Count 1 of the Indictment. But outside of Court, Grant has continued to deny her involvement in the scheme. Specifically, in November 2025, Grant sent the following message to a former employee of Charity 1, where she denies that she participated in the scheme, claims that she is being framed, and only took a plea because she

could not afford an attorney or forensic accounting.  The message is reproduced below in full:



B.     **Procedural Background**

On July 22, 2024, a Grand Jury in the Norther District of California returned an indictment charging Grant with four counts of wire fraud in violation of 18 U.S.C. §1343 and one count of money laundering in violation of 18 U.S.C. §1957.  On August 11, 2025, Grant pled guilty to Count One of the Indictment pursuant to a plea agreement in which the government agreed to recommend a sentence within the applicable guidelines range and to dismiss the open counts at the time of sentencing.

III.    **THE SENTENCING GUIDELINES CALCULATION**

The PSR calculates the offense level as follows (PSR ¶¶ 29-39):

    a.   Base Offense Level,  USSG §§2B1.1(a)(1).                                                         7

    b.   Specific Offense Characteristic:

        a.   USSG §2B1.1(b)(1)(T) (*loss between $1.5 million and $3.5 million*)        +16

    a.   Acceptance of Responsibility                                                                           -3[2]

    b.   Total Offense Level                                                                                              20

---

[2] While the government is troubled by Grant's November 2025 message evidencing a lack of acceptance of responsibility, it asks the Court to consider this as an aggravating factor under the factors laid out at 18 U.S.C. §3553, rather than as cause to withhold the adjustment for acceptance of responsibility under the United States Sentencing Guidelines.

The PSR calculates Grant as being in Criminal History Category I. PSR ¶45. The applicable sentencing guidelines range for Total Offense Level 20 and CHC I is 33-41 months. The government agrees with the PSR's calculations of Grant's sentencing guidelines and criminal history category.

## IV.   SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. A Sentence of 37 Months in Prison is Sufficient but Not Greater than Necessary

The government recommends a sentence of 37 months in prison, which is the midpoint of the applicable guidelines range. This sentence is warranted by the aggravated nature of Grant's offense, in which she stole significant amounts of money from a children's charity, drastically reducing their ability to serve the public. It is also consistent with other sentences recently handed down by judges in this district for similar conduct, and adequately accounts for both the aggravating and mitigating characteristics of the defendant.

#### 1.   Nature and seriousness of the offense

In many embezzlement cases, the seriousness of the offense is captured by the amount of money

that the defendant stole. But even though Grant stole a large amount of money—nearly two million dollars in the final accounting—that number understates the seriousness of her offense. Grant's crime is made significantly worse because of who she stole from, and the impact that has had on the community. Grant's greed took money out of the hands of a charity whose mission is to serve underprivileged children. Although all theft is wrong, in particular thefts of this magnitude, it is especially egregious to steal so much money when you know, as Grant did, that you are stealing from vulnerable victims like the underprivileged children served by Charity 1. Nor was the harm of Grant's crime theoretical: as the President of Charity 1 outlined for the Court, the money Grant stole cost many of Grant's former co-workers their jobs and prevented tens of thousands of students from receiving the benefits Charity 1 provides. This is a serious aggravating factor that must be accounted for in the sentence.

### 2. Characteristics of the defendant

Grant's personal characteristics also support a sentence within the guidelines range. On the one hand, Grant has certain characteristics that are mitigating. Most notably, she has been diagnosed with depression and PTSD, and these mental health issues may have contributed to her offense. But much of Grant's background is less compelling as mitigation: she appears to have had a relatively stable childhood, does not appear to have significant substance abuse issues contributing to her offense, and has a high school diploma. It does not appear that Grant's crime was motivated by desperation or that she had no other legal options; to the contrary, it appears that Grant's crime was motivated by greed and a desire for luxuries that were outside her reach.

Other of Grant's characteristics also tend to aggravate, rather than mitigate, her conduct. Although she is a Criminal History Category I, this understates the seriousness of her criminal history as it relates to this conduct. On March 10, 2016, Grant was convicted of petty theft and sentence to 2 years of probation. The conduct in that crime was similar to the offense against Charity 1: Grant wrote checks to herself from her employers account in order to pay her rent. Grant avoided jail time for that fraud, receiving only unsupervised probation. But she didn't learn her lesson, nor did the probation deter her from further crime. It was less than a year later—and while she was still on probation—that Grant began her fraud against Charity 1. This brazenness in her fraud tends to support at least a guidelines sentence.

1   Grant has also been, at best, inconsistent in her acceptance of responsibility. While the government is not asking that the Court withhold the guidelines reduction for acceptance of responsibility, Grant's private refusal to acknowledge her role in this offense and take accountability for her actions and the harm she caused is troubling. It is inconsistent with other statements Grant has made regarding the remorse she feels for the people that she has hurt. These inconsistent statements suggest that—as with Grant's first fraud conviction—she still has not learned her lesson, and that she is a risk to reoffend in the future. This is an aggravating factor that should be considered in the Court's sentencing analysis, and which supports at least a guidelines sentence.

### 3. Avoiding unwarranted sentencing disparities

The government's sentencing recommendation is in line with sentences in this district for similar conduct, particularly when the aggravated nature of Grant's offense is considered.

For example, on May 21, 2025, Judge Corely sentenced a defendant to 37 months in prison for stealing $1.3 million from a law firm at which he served as Chief Financial Officer. *See United States v. Archuleta-Perkins,* 3:24-cr-00360-JSC. As with Grant, the defendant in *Archuleta-Perkins* abused a position of trust to steal large sums of money. And although the defendant in *Archuleta-Perkins* did not steal from a charity, his offense was similarly aggravated by his stealing from a vulnerable victim suffering severe health problems. The 37-month sentence that he received is therefore in line with the sentence recommended by the government in this case.

In another recent example, on September 24, 2025, Judge Gonzalez-Rogers sentenced Howard Solomon to 27 months in prison for stealing more than $500,000 from a non-profit. *See United States v. Howard Solomon*, 4:25-cr-0054 YGR. The conduct in that case is similar—also concerning theft from a charity. And while the government's recommended sentence in this case is 10 months higher than what Solomon received, this accounts for the fact that Grant stole at least three times as much money he did. Moreover, the 27-month sentence that Solomon received was within his guidelines range, and the government is requesting that Grant receive a sentence within her higher guidelines range.

The government's recommendation is also not inconsistent with sentences received by defendant's outside of the district, as reflected in JSIN data. For defendants with Grant's offense level and criminal history category, the average length of sentence was 25 months, and the median length was

27 months. Which is to say, most defendants in Grant's position receive below guidelines sentences. But for the reasons described above, this is not the average embezzlement case. Grant's conduct was more serious because it involved theft from a charity and the abuse of her position of trust. Grant's background is also more aggravated than the average CHC I offender, since she had been convicted of fraud immediately prior to engaging in this new scheme, and committed the instant offense while still on probation. And although Grant's guidelines range incorporates acceptance of responsibility, she has been at best inconsistent in taking accountability for her actions. So, while the average defendant in Grant's position may deserve a downward variance, Grant does not. Indeed, to provide her with a variance would in fact create a disparity by treating her the same as others with less aggravated conduct.

In order to avoid such unwanted sentencing disparities, the Court should sentence Grant to 37 months in prison, a midpoint guidelines sentence.

### B. Supervised Release

The government recommends a term of supervised release of three years. As with the government's recommendation of 37 months imprisonment, this is in line with the guidelines provision for Grant's offense. 3 years of supervision will help to ensure that Grant does not commit fraud again, as she did while on unsupervised probation after her pervious fraud conviction.

### C. Restitution

The government and defense have had discussions regarding the appropriate restitution amount in this case. The government requests a restitution hearing 90 days from the sentencing hearing. If the parties agree to the restitution amount, they will file a stipulation.

## V. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the defendant to 37 months' imprisonment, 3 years' supervised release, and a $100 special assessment.

DATED: December 1, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Evan M. Mateer*
EVAN M. MATEER
Assistant United States Attorney