1  JODI LINKER, Bar No. 230273
   Federal Public Defender
2  Northern District of California
   ELISSE LAROUCHE, Bar No. 308533
3  Assistant Federal Public Defender
   13th Floor Federal Building - Suite 1350N
4  1301 Clay Street
   Oakland, CA 94612
5  Telephone:   (510) 637-3500
   Facsimile:   (510) 637-3507
6  Email:       Elisse_Larouche@fd.org

7

8  Counsel for Defendant Grant

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14  UNITED STATES OF AMERICA,            **Case No.:** CR 24–403 AMO

15          Plaintiff,                   **REDACTED VERSION OF**
                                         **MATERIAL SOUGHT TO SEALED:**
16      v.                               **DEFENDANT'S SENTENCING**
                                         **MEMORANDUM**
17  CARRIE GRANT,
                                         **Court:**        Courtroom 3, 3rd Floor
18          Defendant.                   **Hearing Date:** December 8, 2025
19                                       **Hearing Time:** 11:00 a.m.

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**CONTENTS**

TABLE OF CONTENTS............................................................................................................i

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ....................................................................................................................1

ARGUMENT .............................................................................................................................2

    I.     The § 3553(a) factors support a sentence of home confinement and probation. ..............2

          A.     Ms. Grant's history and characteristics reveal the reasons for her conduct, and she will not reoffend with the appropriate interventions in place. ................2

               1.     Ms. Grant's mother abandoned her as a child, leaving long-lasting pain that she never confronted or healed from.........................................2

                                      █████████████████████████████████████████████████...4

          B.     Ms. Grant's conduct and spending in the instant offense ....................................8

          C.     A prison sentence is not necessary in this case or supported by the additional §3553(a) factors. .......................................................................................9

    II.    The applicable guidelines are correct but overpunish based on loss enhancements.......11

    III.   Restitution .....................................................................................................................15

CONCLUSION.........................................................................................................................15

1

# TABLE OF AUTHORITIES

2 **Federal Cases** **Page(s)**

3 *Kimbrough v. United States,*
    552 U.S. 85 (2007) ............................................................................... 13
4

*United States v. Adelson,*
5    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................... 11, 13
6
*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) ............................................... 7, 9, 2
7
*United States v. Gupta,*
8    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................... 12, 13

9 **Federal Statutes**

10 18 U.S.C. § 1343 ............................................................................... 11

11 18 U.S.C. § 3553(a) ................................................................... *passim*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Carrie Grant is a 61-year-old mother to her only and beloved adult daughter. She is someone who, after being abandoned by her biological mother, wanted to give her now 25-year-old daughter everything. She is also a woman who has been in an abusive relationship with her daughter's father for some 30 years. Ms. Grant took funds from her employer, Junior Achievement ("JA"), from 2017 to 2023 while she worked there as an office manager and then financial manager. She initially took the funds to make ends meet, but soon, she used the money to give her daughter and her experiences and a life she could not otherwise afford. Ms. Grant is extremely remorseful and ashamed of her actions in this case that led to her taking approximately $1.6 million from JA. She only has one prior conviction – a 2016 misdemeanor conviction for petty theft.

Through this case, Ms. Grant has had to confront painful memories and experiences that she tried to ignore and suppress. She is finally confronting her experiences of abuse, abandonment, and the attendant pain and mental health conditions. She takes full responsibility for her unlawful and extremely detrimental actions in this case.

The parties and Probation agree on the guidelines as set forth in the Presentence Report ("PSR"). PSR ¶¶30-39. With a final offense level of 20 and a Criminal History Category of I, the guideline range is 33-41 months. PSR ¶82. Probation, acknowledging the reasons for Ms. Grant's conduct, her circumstances and mental health, and relative lack of criminal history, recommends a significant downward variance to 18 months' custody and 3 years' supervised release. Ms. Grant has fully accepted responsibility for her conduct pursuant to a plea agreement with the government. Ms. Grant is not someone who needs prison as a necessary punishment or deterrent.

The defense respectfully requests that the Court impose a sentence of five years' probation, with a period of the probation term to be served under home confinement. Such a sentence, in addition to the collateral consequences of Ms. Grant's first felony and federal offense, is serious. It will curtail her liberty, it will subject her to stringent supervision, and, along with conditions of supervision, it will deter her from future criminal conduct and protect the public. If the Court does consider a sentence of imprisonment, the defense emphasizes that Ms. Grant has never been to prison before, so any prison sentence will have an outsized deterrent effect on her. Finally, a sentence of

DEFENDANT'S SENTENCING MEMORANDUM
*GRANT*, CR 24–403 AMO

1

probation with a term of home confinement will allow Ms. Grant the opportunity to continue

working, thereby making progress on restitution. For these reasons, a sentence of five years'

probation and home confinement is appropriate here.[1]

## ARGUMENT

### I.    The § 3553(a) factors support a sentence of home confinement and probation.

"The overarching statutory charge for a district court is to impose a sentence sufficient, but not

greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991

(9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the

seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the

offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes

of the defendant; and (6) provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C.

§ 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline

range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to

avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any

victims of the offense, § 3553(a)(7).

### A.    Ms. Grant's history and characteristics reveal the reasons for her conduct, and she will not reoffend with the appropriate interventions in place.

#### 1.    Ms. Grant's mother abandoned her as a child, leaving long-lasting pain that she never confronted or healed from.

After Ms. Grant's parents separated when she was five years old, she saw her biological mother

at most, infrequently. PSR ¶52. Although Ms. Grant's biological mother continued to live nearby, her

mother was not involved in her life. *See* PSR ¶¶54-56. Her mother's lack of involvement described in

the PSR and the Psychological Evaluation indicates a disinterest and neglect in her role as a mother to

---

[1] Statutorily, the Court can impose a probation term of between one and five years because the offense is a Class C felony. PSR ¶ 85. The U.S. Sentencing Guidelines do not recommend probation because Ms. Grant's guidelines are in Zone D (based on the offense level and loss amount as discussed herein), but the Guidelines are only advisory and not mandatory upon the Court.

1  Ms. Grant. *See id.*; Declaration of Elisse Larouche ("Larouche Decl."), ¶4, Ex. C at 2-4. When Ms.

2  Grant was with her mother, her mother left her with grandparents, took her to boyfriends' homes, and

3  showed a general lack of parenting and care toward her daughter. *See* PSR ¶55. Her mother seemed

4  to struggle financially, and after an incident of passing a bad check, Ms. Grant and her mother were

5  taken in a police vehicle and Ms. Grant's father had to pick her up. PSR ¶55. When Ms. Grant was

6  about ten years old, her mother attempted to regain custody of her – an effort that failed but resulted

7  in more visitation. PSR ¶56. However, again, Ms. Grant's mother would leave her with grandparents

8  and generally abdicate her parenting role. *Id.* At 15 years old, Ms. Grant's mother never showed up

9  for a planned visit. PSR ¶56. Ms. Grant did not have contact with her birth mother again until Ms.

10  Grant was in her 50's. *Id.* Ms. Grant was fortunate to have a loving father and stepmother who cared

11  for her. She recognizes this and states that being in her father's custody was the best thing that could

12  have happened to her. *Id.*

13

14

15

16

17

18

19

20

21

22  Ms. Grant now sees that her actions in this

23  case are, in part, a reaction to birth mother abandoning her and her attempt to give her daughter a

24  relationship and experience that Ms. Grant was deprived of. *Id.* at 4, 9.

25         Scientific literature also shows that there are long-lasting effects of parental abandonment. The

26  childhood trauma of abandonment and lack of adequate care from caregivers "contributes to a

27  spectrum of psychological and interpersonal challenges in adulthood, such as difficulties in

28  establishing and sustaining relationships, feelings of loneliness, social isolation, and the development

of an insecure attachment style."[2] "Parental rejection is a highly traumatic experience for a child, as it implies a lack of interest and affection from the parent or caregiver. This can lead to both physical and psychological damage, as the child may feel unloved and unwanted."[3] Until recently, Ms. Grant brushed off her mother's abandonment with statements like, "I was better off without her," and "I didn't really care about it." This process of this case, however, including her psychological evaluation, reflecting on her conduct, and Ms. Grant requesting mental health treatment, have revealed a deeper pain and effect of the abandonment that she experienced. Fully acknowledging this past has provided Ms. Grant with insight into her conduct and the ability to recognize negative coping mechanisms going forward.



---

[2] E. Topino, & A. Gori, Childhood neglect and its effect on self-conception and attachment in adulthood: A structural equation model, Psychological Trauma: Theory, Research, Practice, and Policy, at 2 (Apr. 14 2025), https://pubmed.ncbi.nlm.nih.gov/40232769/ (citing additional sources).
[3] M. Marici et al., Is rejection, parental abandonment or neglect a trigger for higher perceived shame and guilt in adolescents?, Healthcare, 11, 1724, at 2 (2023), https://pubmed.ncbi.nlm.nih.gov/37372842/.

DEFENDANT'S SENTENCING MEMORANDUM
*GRANT*, CR 24–403 AMO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14     The link between intimate partner abuse and mental health consequences have been well

15 documented, with PTSD and depression as the most commonly identified disorders.[4] Studies have

16 also shown that psychological abuse can inflict greater distress as compared to physical acts of

17 violence.[5] In one study reported symptomatic responses to abuse, including PTSD and depression,

18 were largely predicted by psychological abuse, rather than by physical violence.[6] Intimate partner

19 violence ("IPV") and PTSD are also "related to negative cognitions about the self, the world, and the

20 dependability of others," and "attachment anxiety and dependency can lead to problems in emotional

21

22

23     [4] M.B. Mechanic et al., <u>Mental health consequences of intimate partner abuse: A multidimensional</u>

24 <u>assessment of four different forms of abuse</u>, Violence Against Women, 14(6), 634-654 (2008) (citing additional studies), https://pmc.ncbi.nlm.nih.gov/articles/PMC2967430/; G. Lausi et al., <u>Decision-</u>

25 <u>making and abuse, what relationship in victims of violence?</u>, International Journal of Environmental Research and Public Health, 20(10), 5879 (2023), https://pubmed.ncbi.nlm.nih.gov/37239605/; E.M.

26 Lund & K.B. Thomas, <u>The association between physical and psychological domestic violence</u> <u>experienced during the COVID-19 pandemic and mental health symptoms</u>, International Journal of

27 Environmental Research and Public Health, 20(4), 3312 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC9958925/doi:https://doi.org/10.3390/ijerph20043312.

28 [5] Mechanic, <u>supra</u>, at 635-36 (citing additional sources).
[6] <i>Id</i>.

DEFENDANT'S SENTENCING MEMORANDUM
<i>GRANT</i>, CR 24–403 AMO

regulation."[7] Literature and studies have shown that IPV is linked to low self-esteem and self-worth as women describe "ridiculing behaviors as particularly pernicious," and "taunting, degrading behavior may influence depression via its eroding effect on self-esteem and self-worth."[8] These issues can be especially prevalent where alcohol abuse is involved. "Commonly alcohol-related emotional abuse included insulting, belittling, humiliating in private or public (e.g. calling names, degrading comments) and treating the woman with contempt and disrespect."[9] Women who experienced these issues reported feelings of shame, humiliation, embarrassment, loneliness, and social isolation connected to their partner/husbands' drinking.[10]

Finally, studies show that women suffering from IPV are often unable to put an end to their situations. There is an underreporting of domestic violence for personal reasons such as embarrassment or fear of retaliation, and also for societal reasons, including imbalanced power relations or institutions not taking women seriously or engaging in victim blaming.[11] Intimate partner violence is also associated with insecure attachment patterns that result in difficulty in women leaving an abusive relationship as "attachment anxiety exacerbates the normal fear of separation and loss in ending long-term relationships."[12]

[redacted]

The Court should consider Ms. Grant's vulnerable emotional and mental state when she committed the present offense. Her circumstances indicate that she was looking for an escape from her daily, abusive environment and a way to care for her daughter who was also subjected to the same

---

[7] S. Scott & J.C. Babcock, Attachment as a moderator between intimate partner violence and PTSD symptoms, J. Fam. Violence, 25(1), 1-9, at 2 (2010), https://pubmed.ncbi.nlm.nih.gov/23710109/.
[8] Mechanic, supra, at 650.
[9] I.M. Wilson et al., A global review of the impact on women from men's alcohol drinking: The need for responding with a gendered lens, Global Health Action, 17(1) at 4 (2024), https://pubmed.ncbi.nlm.nih.gov/38700277/
[10] Id.
[11] See, e.g., E. Gracia, Unreported cases of domestic violence against women: towards an epidemiology of social silence, tolerance, and inhibition, J Epidemiol Community Health, Jul. 58(7):536-7 at 546 (2004) https://pmc.ncbi.nlm.nih.gov/articles/PMC1732820/.
[12] Scott, supra, at 2.

DEFENDANT'S SENTENCING MEMORANDUM
GRANT, CR 24–403 AMO

1    environment.

2        **B.      Ms. Grant's conduct and spending in the instant offense.**

3        This Court must also consider the nature and circumstances of the offense. § 3553(a)(1). Here,

4    Ms. Grant's actions had a serious and immense impact on the victim organization. Her actions,

5    however, are best understood in the context of Ms. Grant's broader life experiences and

6    circumstances. Much of Ms. Grant's spending and choices stem from trying to address the traumas of

7    her birth mother's abandonment and being in a long-term abusive relationship. Initially, as Ms. Grant

8    began to engage in taking money from JA, Ms. Grant was struggling financially to make ends meet.

9    Her partner was not working or contributing financially, and Ms. Grant's salary alone was

10   insufficient to pay bills and provide the life she wanted to give to her daughter. Eventually, however,

11   Ms. Grant started to see how "easy" it was to go undetected as she rerouted money into her own

12   account from JA. Ms. Grant began to use the funds for what she could not afford on her own.

13       Ms. Grant spent much of the money on her daughter. She and her daughter visited Hawai'i

14   before her daughter ultimately attended college there. Ms. Grant later paid for her daughter's college

15   and living expenses in Hawai'i with little regard to what was affordable. She paid for rent, bought a

16   condominium (subject to a short-term leasehold) for her daughter to live in, and she paid for living

17   expenses like travel and food.

18       For Ms. Grant's part, she spent money yes, on the experiences the government points to. But

19   her spending also indicates someone who wanted freedom from her reality and who was seeking

20   confidence, independence, and affirmation. Ms. Grant spent considerable funds, over $90,000, on

21   programs for weight loss and health and fitness, programs for business skills and entrepreneurship,

22   and an investment trying to start her own company. Larouche Decl. ¶7. Many of the expenses were

23   membership programs that promised a different life including a healthier lifestyle, financial

24   independence, confidence, and a more successful career. After Ms. Grant had been subject to her

25   partner's abuse and degrading comments, Ms. Grant hoped for a different life through superficial

26   programs that targeted individuals seeking affirmation.

27       Ms. Grant also problematically sought happiness through traveling to Hawai'i, shopping for

28   herself and her daughter, and entertainment experiences. Her home life and relationship had been

DEFENDANT'S SENTENCING MEMORANDUM
*GRANT*, CR 24–403 AMO

negative and toxic for years and she tried to escape through experiences that gave her something to enjoy and retail goods that offered fleeting pleasure. Obviously, her actions were a deeply misguided attempt to feel better and one that caused immense negative impact.

Ms. Grant also continued to financially support the family – in total, she spent approximately $445,000 on rent for the family's home, household expenses and utilities, college and college living expenses for her daughter, medical expenses, and groceries. Larouche Decl. ¶7.

Ms. Grant's spending, while obviously selfish in terms of the effect of her conduct on her employer and its mission, was also her attempt to escape while she was trapped in an abusive relationship and had unresolved trauma from her upbringing. Ms. Grant was seeking a way to boost her self-esteem and self-worth that had been trampled upon for years. "The isolation caused by IPV [can] weaken individual's self-esteem, thereby triggering a sense of worthlessness and further deepening the depression symptoms and anxiety of" those experiencing IPV.[13] In addition to the effect on self-esteem, studies have shown that IPV can also lead to functional impairment. "By gradually eroding a victim's resources to cope with adversity, exposure to cumulative traumatic events is associated with chronic stress, distress, and impairment."[14] Secondary long-term effects of PTSD and depression also impact decision-making and cognitive function impairments.[15]

In sum, Ms. Grant made deeply misguided and selfish choices in the conduct that brings her before this Court. The motivating factors for her conduct, however, show that she is not just a selfish person seeking to live a lavish lifestyle, but that she was someone financially supporting her family and seeking affirmation and an escape from her painful reality.

**C.    A prison sentence is not necessary in this case or supported by the additional § 3553(a) factors.**

The additional § 3553(a) factors also guide this Court to a conclusion that a prison sentence is not necessary in this case. The sentence must of course reflect the seriousness of the offense, promote

---

[13] B. Zhang et al., The association between psychological distress, abusive experiences, and help-seeking among people with intimate partner violence, BMC Public Health, 24, 1-9, at 6 (2024), https://www.researchgate.net/publication/379867670_The_association_between_psychological_distress_abusive_experiences_and_help-seeking_among_people_with_intimate_partner_violence.
[14] Mechanic, supra, at 648.
[15] Lausi, supra, at 3.

respect for the law, and provide just punishment for the offense. § 3553(a)(2)(A). A sentence of five years' probation, with a period to include home confinement, is serious. Ms. Grant would be confined to her home and lose her liberty to leave freely. She would be subject to an ankle monitor and tracking of her exact movements. Ms. Grant would be supervised by probation and would only be able to leave her home for work and medical appointments. Such a sentence would promote respect for the law and provide just punishment as it would be a significant curtailment of her liberty and freedom. It would signal to the public that serious federal intervention will follow any fraudulent conduct of the type here, with lasting effects. Additionally, Ms. Grant must pay back restitution.

Indeed, Ms. Grant is punished significantly through the collateral consequences of this offense. The public information of her offense along with her first felony conviction affects her ability to obtain a good, well-paying job going forward. Unlike other defendants, who may be able to find a job after a felony conviction doing more manual or specific skill-based labor, Ms. Grant has spent her career in administrative work. Given her field of work and her present offense, it will be very difficult for her to obtain solid employment going forward. Even since this case has been pending, she had trouble obtaining work in her field and spent some time working in retail to have some income. PSR ¶75. As Ms. Grant's letter to the Court shows, she also feels the collateral consequences of her offense in how her conduct has negatively impacted her daughter. Ms. Grant feels deep remorse for the challenges and difficulty she has and will cause her daughter.

Prison will not serve any additional, necessary function in this case. Ms. Grant is extremely remorseful for her conduct as described in her letter to the Court. She is not someone who has repeatedly broken the law and needs specific deterrence. While she committed a misdemeanor fraud offense in 2015 shortly before the present offense, that was a minor offense with a minor consequence. Unfortunately, it was not a significant enough intervention to change her behavior at the time. There was nothing like the publicity or collateral consequences she now faces with her first felony and a federal offense. There was also nothing like the supervision she will receive on a federal case should the Court impose home confinement and probation. The implications of this case and the consequences that follow, even without a prison sentence, are serious. She has lost her career, the trust of her colleagues, the ability to obtain certain jobs, and disappointed the person most important

1   to her, her daughter. All these consequences will sufficiently deter Ms. Grant. § 3553(a)(2)(B).[16]

2       In addition, probation's stringent supervision will protect the public from any potential of

3   future crimes by Ms. Grant. § 3553(a)(2)(C). Ms. Grant will be subject to a broad search condition of

4   her property and devices. She will not be able to make significant purchases or open a new line of

5   credit without probation's permission. And probation and the government will have access to Ms.

6   Grant's finances while she must make her hefty restitution obligations. These and the other

7   supervision conditions, along with any portion of home confinement, will protect the public.

8       Finally, Ms. Grant's educational and vocational training, medical care, and correctional

9   treatment can be most effectively treated outside of custody. Ms. Grant has never received mental

10   health counseling. She requested it as part of pretrial services this past March, but due to delays and

11   issues with the treatment provider, she only began those services in the past month and then her

12   treatment provider was not available. In short, Ms. Grant desperately needs and now knows she needs

13   mental health treatment. The BOP is not equipped to provide the treatment she needs. Ms. Grant also

14   needs to work toward a large restitution amount. Going into prison will not only delay her ability to

15   pay restitution but could hinder her ability to work on vocational training that would better equip her

16   to find a job that will help toward restitution. Finally, Ms. Grant has a heart condition (Mitral Valve

17   Prolapse) and sleep apnea, which although managed, will require additional medical care that may

18   limit Ms. Grant's BOP placement. *See* PSR ¶65.

19   **II.**   **The applicable guidelines are correct but overpunish based on loss enhancements.**

20       The parties and Probation agree on the guidelines set forth in the PSR. ¶¶30-39. The base

21   offense level is 7 for a violation of 18 U.S.C. § 1343 and there is a 16-level enhancement based on

22   the approximate loss amount of $1,671,218.08 which is between $1.5 million and $3.5 million. Ms.

23   Grant receives a three-level reduction for acceptance of responsibility, resulting in a final offense

24   level of 20. Ms. Grant has one prior misdemeanor conviction for petty theft for which she received a

25

26   _____

27   [16] Should the Court consider a prison sentence, there is substantial empirical evidence that "even relatively short sentences" have "a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 F. App'x

28   93 (2d Cir. 2008); Richard Frase, *Punishment Purposes*, 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998).

1   sentence of 2 years' probation in 2016. PSR ¶42. This results in one criminal history point and places

2   her in Criminal History Category I. PSR ¶¶43, 45. The final guideline range is 33-41 months. PSR

3   ¶82. Probation recommends a downward variance and sentence of 18 months' custody and 3 years'

4   supervised release. The defense agrees with Probation that a significant variance is warranted here

5   based on the § 3553(a) factors but also because the loss amount results in excessive guidelines.

6       The guidelines are legally accurate, and Ms. Grant acknowledges that the loss amount is

7   relevant and correlated to culpability. However, the guidelines loss enhancement produces an

8   excessively high sentencing range because the enhancement is based on a provision that is

9   inconsistent with the objective, data-driven premise of the Sentencing Guidelines. The purpose of the

10  Sentencing Guidelines was to bring predictability and uniformity to federal sentencing by creating

11  guidelines based on empirical data, drawn from past practice of federal sentencing courts throughout

12  the United States. But from their inception, the fraud guidelines were anomalous in that they did not

13  reflect the Sentencing Commission's data on the sentencing practices of courts throughout the

14  nation.[17]

15      The loss table offense levels were instead set higher than national sentencing trends, on the

16  belief that longer sentences would serve as a general deterrent. After promulgating this higher-than-

17  normal set of Guidelines, the Commission amended the Guidelines several times to increase the loss-

18  based enhancements.[18] The enhancements have been increased in a "one-way upward ratchet

19  increasingly divorced from considerations of sound public policy and even from the commonsense

20  judgments of frontline sentencing professionals who apply the rules."[19] These changes were made

21  despite the fact that no empirical evidence supported the deterrence theory on which they were

22

23  _____

24  [17] *See* M. W. Bennett, et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 950-51 (2017) (explaining that the Commission intentionally crafted the initial guidelines to require more severe punishment than had historically been the case for white-collar offenses).

25

26  [18] *Id*. at 952-53; *see also* Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis,* 105 Colum. L. Rev. 1315, 1319-20 (2005).

27  [19] *Id*. at 1319-20; *see also* Frank O. Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 168, 2008 WL 2201039 (2008); *United States v. Gupta,* 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd,* 747 F.3d 111 (2d Cir. 2014) (explaining that the Guidelines amendments from 1987 to 2003 would increase a hypothetical offender's range by more than 500%, without any explanation for why the offense was "500% worse in 2003 than it was in 1987").

28

1    purportedly based.

2        Sentencing courts have tremendous discretion to disagree, on policy grounds, with Guidelines

3    recommendations. *See Kimbrough v. United States,* 552 U.S. 85, 109-110 (2007) (holding that when

4    a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role,"

5    or fails to "take account of empirical data and national experience," the sentencing court is free to

6    conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s

7    purposes, even in a mine-run case.") (cleaned up). With respect to sentences in fraud cases, courts

8    have frequently exercised that discretion, rejecting the outsized loss enhancements in § 2B1.1

9    because they are not based on empirical data. *See, e.g., Gupta,* 904 F. Supp. 2d at 351 (imposing a

10   below-Guidelines sentence of 24 months' imprisonment on defendant who caused $5 million in loss,

11   due to inadequacy of the Guidelines); *Adelson,* 441 F. Supp. 2d at 509 (imposing below-Guidelines

12   sentence and criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases

13   on the amount of actual or intended financial loss" without any explanation of "why it is appropriate

14   to accord such huge weight to [this] factor[ ]").[20]

15       Federal judges routinely sentence defendants convicted of financial fraud to sentences well

16   below the recommended Guidelines range. Nationally, *60%* of defendants convicted of fraud, theft,

17   or embezzlement receive sentences below their Guidelines range.[21] For other offenses the average

18   downward departure is 35.1%.[22] In cases that involve fraud, theft, or embezzlement, the average

19   downward reduction is significantly higher—*51.4%.*[23] This data strongly suggests that "the judiciary

20   sees a consistent disjunction between the sentences prescribed by the Guidelines . . . and the

21

22

23   [20] *see also* Derick R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentencing Regime in White-Collar Criminal Cases,* 59 Duke L. J. 1001, 1035 (2010) ("Early cases indicate that

24   appellate courts are upholding the decisions of sentencing judges who, based on policy concerns, apply *Kimbrough* to deviate from the white-collar crime Guidelines. If this trend continues, courts

25   could begin to move away from the Guidelines' distracting and destructive emphasis on the loss calculation and toward sentences designed to achieve the purposes set forth in § 3553(a).").

26   [21] U.S. Sentencing Commission, *Sentence Imposed Relative to the Guideline Range by Type of Crime*, Datafile, 2023, available https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2023/Table31.pdf.

27   [22] U.S. Sentencing Commission, *Extent of Downward Variances by Type of Crime*, Datafile, 2023, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2023/Table40.pdf.

28   [23] *Id.*

DEFENDANT'S SENTENCING MEMORANDUM
*GRANT*, CR 24–403 AMO

fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives."[24]

Intertwined with the argument that loss amounts result in excessively large sentencing guidelines, is the issue of disparity in fraud cases. It is not uncommon for individuals charged with fraud offenses to receive sentences of probation. For example, in one recent case, Judge White sentenced a defendant to time served (client was out of custody) and three years' supervised release where the defendant, a Bishop, took funds from his church, resulting in over $12 million in restitution owed. 4:22-cr-3-JSW, Dkt. 232. In other fraud cases, defendants also received no prison time. *See, e.g.*, 4:22-cr-359-YGR, Dkt. 36 (4 years' probation for insider trading case). In other insider trading cases, individuals were never prosecuted or never faced federal criminal charges. *See, e.g.*, *SEC v. Peter D. Nunan*, 16-cv-2373-LHK (N.D. Cal) (Silicon Valley tech executive who traded on insider information, shared that information to family, and faced civil disgorgement, penalties, and interests payments of $534,3030, but does not appear to have been charged criminally). And today, many possible fraud defendants or prior fraud defendants, including those in the crypto world who support President Trump, have been pardoned or otherwise have avoided penalties.[25] Ms. Grant must face the consequences for the harm she clearly caused to her employer and that was deeply felt by its staff and mission. The Court must also bear in mind the need to avoid disparities in fraud cases and the questionable rationale of general deterrence in an environment where many fraud cases go unprosecuted.

Ms. Grant understands that the amount she took from JA had a direct impact on the organization's budget and its ability to carry out its mission. The defense asks only that the Court recognize that the loss enhancement alone provides an enormous increase in the sentence, especially where the loss amount here (approximately $1.6 million) just exceeds the higher +16 enhancement

---

[24] Frank O. Bowman, *Sentencing High-Loss Corporate Insider Frauds*, 20 Fed. Sent. R. at 169, 2008 WL 2201039, at *4 (Feb. 2008); *see also* Bennett, <u>supra</u>, at 963-64 (statistics showing that as guidelines range increases based on loss, there is an increasing divergence with the sentence actually imposed).
[25] *See* Dan Alexander, *Trump's Cyrpto Cronies: They Sent The President Money—And Got Off Easy*, Nov. 25, 2025, https://www.forbes.com/sites/danalexander/2025/11/25/trumps-crypto-cronies-they-sent-the-president-money-and-got-off-easy/.

threshold of $1.5 million, and such an increase is not justified by data reflecting actual sentencing practices.

**III.    Restitution**

The parties have not yet agreed upon the specific amount of restitution. The government has conducted additional analysis since its analysis for the restitution amount noted in the plea agreement and the parties need further time to discuss restitution. The defense would request a restitution hearing be set approximately 75 days from sentencing. The defense anticipates that the parties will reach an agreement prior to the restitution hearing and would plan to submit a stipulation once an agreement is reached. The defense has discussed these steps with the government and understands the government is in agreement.

**CONCLUSION**

For the reasons above, the defense respectfully requests that the Court impose a sentence of five years' probation, to include a portion of home confinement. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes of the sentencing factors.

Dated:        December 1, 2025                    Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

_____/S_____
ELISSE LAROUCHE
Assistant Federal Public Defender